IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEBORAH HITE, | : | |
|     Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 17-131 |
| | : | |
| MANOR JUNIOR COLLEGE, d/b/a | : | |
| MANOR COLLEGE, and JOHN DEMPSTER | : | |
|     Defendants. | : | |

McHUGH, J.                                                                                                      March 29, 2018

<u>**MEMORANDUM**</u>

This is a Title VII case that underscores the importance of factual nuances and context in resolving cases alleging employment discrimination. Plaintiff Deborah Hite is an African American who worked at Manor Junior College for eight months until she resigned in what she asserts was a constructive discharge. She claims that she was subjected to a hostile work environment, racially-based disparate treatment, and retaliation by Defendant Manor College and her supervisor, Defendant John Dempster. She cites a panoply of evidence, including the use of racially charged language by fellow employees and supervisors. Defendants now move for summary judgment on all claims. I find that Plaintiff has set forth prima facie claims for hostile work environment and disparate treatment, and presented evidence suggesting that Defendants' conduct cannot be explained as simply a matter of office management. Defendants' Motion will therefore be denied, except as to Plaintiff's retaliation claim, to which there is no opposition.

**I. Background**

The Third Circuit has cautioned that "a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Andrews v. City of Philadelphia*, 895 F.2d

1

1469, 1484 (3d Cir. 1990). Because I must view the record in the light most favorable to the plaintiff, the question is whether the evidence, taken as a whole, could lead a reasonable jury to find that Plaintiff Deborah Hite was the victim of racial discrimination. The record in this case is voluminous. Rather than parse the relatively minor deviations in the parties' respective versions of the facts, and the vastly different inferences they ask me to make, I set forth a summary below that resolves disputes and draws reasonable inferences in favor of Plaintiff. *See Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).

When Ms. Hite began working for Defendant Manor College as an Admissions Counselor in January 2015, she was the only African American woman in her department.[1] Plaintiff, who has a Master's degree, was hired at a salary of $40,000 to replace a departing counselor with the same professional credentials who had been earning that amount. On her first day of work, she learned that she earned more than her fellow counselors (none of whom had a Master's), and that her higher salary had already been disclosed to her department in violation of Manor policy. According to Plaintiff, this drew resentment from her colleagues; fellow employees and Defendant Dempster were openly hostile to her as soon as she arrived. She was not introduced to other members of the department, not trained or fully briefed on her duties, and not advised as to her chain of command. (She would later learn, after intervention by Human Resources (HR), that Defendant Dempster was her direct supervisor.)

Plaintiff further contends that another employee, who was not African American, used the N-word to refer to another person when he was speaking to Plaintiff on her first day. The next week, the same employee used the slur again when he and Plaintiff were in his car, directing

---

[1] The department's only other African American employee, a male, left during Plaintiff's tenure at Manor.

2

Plaintiff's attention to a person of color who he said was sleeping at a red light.[2] Despite Plaintiff telling him that she found the word offensive and racist, he and another employee, who was white, frequently played rap music at a loud volume that included the N-word throughout Plaintiff's time at Manor.

Plaintiff also maintains that her supervisor, Defendant Dempster, suggested that she was hired based on her race, rather than on merit. Dempster told Plaintiff that another supervisor, who had played a role in her hiring, "thought he was black" and "had a thing for black women"— a preference Dempster "[didn't] understand." Pl. Dep. 153:3–9, 290:22–24, ECF No. 14-1. Dempster insinuated that this other supervisor might have had a romantic interest in Plaintiff.[3] Dempster also told Plaintiff about a former employee who was an African American woman, and said that he and others would make fun of her and call her "the little brown girl." *Id.* at 155:12–16. Plaintiff learned that the employee ultimately sued Manor for race discrimination.

Plaintiff testified that Defendant Dempster and others subjected Plaintiff to rules that did not apply to other members of the department, and criticized her for conduct that other employees engaged in without reprimand, including purported dress code violations and unkempt desks. The record includes many instances of rude and dismissive behavior toward Plaintiff from co-workers and supervisors alike. Manor's newly-hired HR director observed that Plaintiff's co-workers "will do anything they can to drive [her] out," and that Dempster ignored Plaintiff, "showed no respect or caring for [her] or anything she had to say," and wanted her

---

[2] Use of the N-word by Plaintiff's fellow employee is one of the facts in dispute in this case. Although Manor's HR position was vacant when Plaintiff was hired, an HR director was hired about a month after Plaintiff started, and Plaintiff reported these incidents then. HR's limited investigation consisted of asking the employee if he said it, which he denied. HR then deemed the allegation "unfounded," counseling the employee that that kind of language should not be used at Manor, and ended the investigation. Colella Dep. 16:12–17:4, ECF No. 18-20.

[3] In an email with Manor's HR director, Dempster wrote that Plaintiff had been hired because Manor "needed an African American woman in the office." ECF No. 18-8.

fired. HR Notes, ECF Nos. 18-12, 18-13. Following Manor's harassment and discrimination protocol, Plaintiff frequently expressed concerns to HR, Dempster, and other superiors, but received inadequate responses or none at all. In fact, near the end of her time at Manor, Dempster reprimanded Plaintiff for carbon-copying the HR director on emails she sent to Dempster setting forth her concerns, despite the HR director having invited Plaintiff to do so. Plaintiff applied for a promotion, which she did not receive, and told HR several times that she would be forced to leave if conditions did not improve.

Ultimately, in early September 2015 after a particularly upsetting confrontation with Dempster and another employee, Plaintiff drafted a letter of resignation. She cited harassment and discrimination as her reason for leaving and delivered the letter to Manor's dean. The dean apologized for Plaintiff's experience, commenting that "she [the dean] didn't understand racism" and hoped Plaintiff would be appreciated by a future employer. Pl. Dep. 307:11–22. Plaintiff offered to stay seven additional days in order to complete certain projects affecting students, but was asked to leave the day after delivering her letter, and was escorted out of the building by security. Manor hired a white woman to replace Plaintiff.

Defendants dispute comparatively few of these facts but suggest non-discriminatory explanations for Plaintiff's negative interactions with her co-workers. Defendants point to evidence that Plaintiff's difficulty acclimating to her position was not related to her race, and claim that her experience improved with the passage of time. There is also evidence that the Admissions Department suffered from prolonged mismanagement, which Manor's top leadership had delayed in addressing because the college was in a period of transition. But that is very much a matter of interpretation. As the Supreme Court has stated: "Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding

4

circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) (citation omitted).

## II. Standard

Defendants' motion is governed by the well-established standard for summary judgment set forth in Federal Rule of Civil Procedure 56, as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317 (1986). At this stage, Plaintiff, the non-movant, may rely on any evidence, including that which "as it stands now is hearsay," as long as it is "capable of being admissible" at trial. *See Petruzzi's IGA Supermkts. v. Darling-Delaware Co.*, 998 F.2d 1224, 1235 n.9 (3d Cir. 1993); *see also Williams v. Borough of West Chester*, 891 F.2d 458, 465–66 n.12 (3d Cir. 1989) (citing *Celotex*, 477 U.S. at 324).

## III. Discussion

Plaintiff Hite filed this suit for race discrimination against Manor College under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and against both Defendants under the Pennsylvania Human Relations Act (PHRA), 43 Pa. Cons. Stat. § 955.[4] She alleges that she was subjected to a hostile work environment, disparate treatment resulting in her constructive discharge, and retaliation. Although Plaintiff's claims arise under both federal and state law, they are appropriately analyzed together because "the standards are the same for purposes of determining the summary judgment motion" in race discrimination cases. *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999); *Crawford v. Verizon Pennsylvania, Inc.*, 103

---

[4] Unlike Title VII, under which individual employees cannot be liable, *see Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996), the PHRA includes an aider-and-abettor provision that can apply to individual employees, including supervisors like Defendant Dempster, *see* § 955(e). In relevant part, the section reads: "It shall be an unlawful employment practice . . . [f]or any person . . . to aid, abet, incite, compel or coerce the doing of any act . . . or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice." *Id.*

F. Supp. 3d 597, 603 (E.D. Pa. 2015) ("The same legal standards apply to Title VII and PHRA claims."). Although Defendants seek summary judgment on all claims, Plaintiff does not object to dismissal of her retaliation claim, so this analysis is limited to her hostile work environment and disparate treatment claims.

For Plaintiff's hostile work environment claim to survive summary judgment, she must point to evidence in the record from which a factfinder could reasonably find that (1) she suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3) it detrimentally affected her and (4) would detrimentally affect a reasonable person in like circumstances; and (5) that her employer is responsible. *See Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017). Defendants do not challenge parts (3) and (4), but argue that Plaintiff cannot prove parts (1), (2), or (5). Defs.' Mot. Summ. J. 18, ECF No. 14 [hereinafter "Defs.' Mot."]; Defs.' Reply 4–5, ECF No. 19.

Plaintiff's disparate treatment claim is governed by the *McDonnell Douglas* burden-shifting framework, under which she must make an initial showing that she (1) is African American; (2) was qualified for the admissions counselor position; (3) suffered an adverse employment action—*i.e.*, that she was constructively discharged; and (4) that the action, when taken together with other facts and if left unexplained, would permit an inference that the adverse action was motivated by discriminatory animus. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). To prove that she was constructively discharged, Plaintiff must show that Manor knowingly permitted conditions of discrimination so intolerable that a reasonable person subject to them would resign. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013) (quoting *Aman v. Cort Furniture Rental Corporation*, 85 F.3d 1074, 1084 (3d Cir. 1996). Defendant

acknowledges that Plaintiff satisfies prongs one and two, but argues that she cannot prove a prima facie case because she cannot show that she was constructively discharged, or that the conditions that led to the alleged discharge were based on race. Defs.' Mot. 9, 11. Alternatively, assuming Plaintiff has set out prima facie case, Defendant attempt to satisfy *McDonnell*'s second step by presenting a legitimate, non-discriminatory reason for their actions: necessary office management. *Id.* at 15. They further argue that Plaintiff cannot carry her burden under *McDonnell*'s third step to show that Defendants' stated reason is pretext. *Id.*

Based on my review of the record as set forth above, I conclude that Plaintiff has presented ample evidence from which a jury could find in her favor on both claims, and that several questions of material fact remain. Defendants make several cross-cutting arguments to the contrary, which apply to both of Plaintiff's overlapping claims. I review and reject Defendants' three primary arguments in turn.

First, Defendants argue that the Court may not consider her fellow employee's alleged use of the N-word or any other evidence from before March 11, 2015, in evaluating Plaintiff's Title VII claims (or before July 9, 2015, for her PHRA claims) because the evidence is barred by the 300/180 day statutes of limitations. Defs.' Mot. 7. But the Supreme Court has made clear that, even where the statute of limitations prevents a plaintiff from asserting a claim based on a discrete discriminatory act, the statute does not "bar an employee from using the prior act[] as background evidence in support of a timely claim." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Thus, even if use of the N-word and other relevant conduct occurred more than 300 days before Plaintiff filed her case, such evidence would still be relevant and admissible in both claims. By definition, a hostile work environment claim is "composed of a series of separate acts

that collectively constitute one 'unlawful employment practice,'" so it "does not matter that some of the component acts of the hostile work environment fall outside the statutory period." *Morgan*, 536 U.S. at 117. As long as one "contributing act" falls within the period, "the entire time period of the hostile environment may be considered." *Id.* Defendants' argument makes even less sense in the context of a constructive discharge claim because in *Green v. Brennan* the Supreme Court held that Title VII's 300-day period starts on the day the employee resigns and not on the date of the last discriminatory conduct. *See* 136 S. Ct. 1769, 1774 (2016).[5]

Second, Defendants argue that the record is inconsistent with Plaintiff's claims for constructive discharge and hostile work environment because, in spite of the alleged discrimination, she stayed at Manor for eight months, applied for a promotion, and gave advance notice of her resignation. *See* Defs.' Mot. 10, 24. Stated differently, Defendants insist that if the workplace were truly hostile, Plaintiff would have quit when she first threatened to, and would not have stayed eight months or sought a promotion. And if conditions had become intolerable, she would have quit without notice. *Id.* This argument ignores clear Third Circuit law to the contrary.

In fact, the Third Circuit has cited an employee's *failure* to request a new position and to file a grievance as grounds to deny a constructive discharge claim. *See Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993) (finding it "highly significant" that plaintiff employee "never requested to be transferred to another position, [and] never advised the [employer] that she would feel compelled to leave if changes regarding the manner in which she was being supervised were not made"). "A reasonable employee will usually explore such

---

[5] The absurdity of Defendants' approach is easily illustrated by considering the case of a plaintiff who files a timely charge on the 300th day after departure. If courts were to adopt Defendants' reasoning, such a plaintiff would literally have *no* permissible evidence, because, by definition, plaintiff would have put an end to any discriminatory conduct upon leaving 300 days before.

8

alternative avenues thoroughly before coming to the conclusion that resignation is the only option," the *Clowes* Court reasoned. *Id.* Similarly, the Third Circuit in *Aman v. Cort Furniture Rental Corporation* found in favor of two African American women employees who brought hostile work environment and constructive discharge claims, even though both women had applied for and received promotions during the subject time period. *See* 85 F.3d at1078. It is, after all, natural for an employee who is mistreated by her peers and superiors to seek a new and higher position—even if the promotion is not guaranteed to fix the problem. *See id.* (despite plaintiff's promotion and "outstanding performance" in that role, "Aman's new position as credit manager did nothing to increase the respect of her fellow employees."). *Aman* also forecloses Defendants' argument that Plaintiff's resignation with seven days' notice destroys her constructive discharge claim. *See id.* at 1079, 1084–85. Aman had worked for two years when her attorney contacted the employer "alleging intolerable conditions." She then worked four more weeks before resigning with an additional four days' notice. *Id.* The *Aman* Court explained:

> The fact that Aman had been subject to continuous discrimination during her employment could support a conclusion that she simply had had enough. No other precipitating facts were legally required . . . . [T]hat Aman left four weeks after her attorney contacted [the employer] alleging intolerable conditions does not preclude a finding that a reasonable person would be compelled to resign under the circumstances. A jury could conclude that the conditions of her employment were intolerable, and that while she had the fortitude to stay, her strength finally failed.

*Id.* at 1084–85.

The Third Circuit has similarly held that the fact that an employee remains in a workplace for months or even years does not foreclose a hostile work environment claim. *See Abramson v. William Paterson Coll. of New Jersey,* 260 F.3d 265, 279–80 (3d Cir. 2001). In *Abramson*, a religious discrimination case, the court viewed harassment that had built up over

9

two years "as a whole" and found it pervasive enough for plaintiff's hostile work environment claim to survive summary judgment. Even though "[n]o one event alone [stood] out from the rest," the *Abramson* Court explained that courts should not consider each incident in isolation, but must decide if a jury could find that the "sum total of abuse over time" amounted to a hostile work environment. *Id.* (citing *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 155 (3d Cir. 1999)). Plaintiff's eight months at Manor are well within the two-year time period upheld in *Abramson*.

Third, and most importantly, Defendants insist that, even accepting Plaintiff's version of events, a jury could not infer that the complained of conduct was "based upon her race."[6] Defs.' Mot. 11. With this argument, articulated in various forms throughout the briefs, *see* Defs.' Mot. 11, 18, Defs.' Reply 1, Defendants seek to undermine the intentional discrimination prong of Plaintiff's hostile work environment claim, the discriminatory animus prong of her disparate treatment case, and her evidence of pretext. In essence, Defendants ask the Court to ignore context and consider only direct evidence of overtly racial discrimination. But as early as 1973, the Supreme Court warned that "Title VII tolerates no racial discrimination, subtle or otherwise." *McDonnell*, 411 U.S. at 801. Defendants' dated view of discrimination law defies this mandate and the Third Circuit's more recent efforts to implement it.

In *Aman*, Judge Timothy Lewis eloquently explained how Title VII analyses have evolved along with the public's perception of what constitutes acceptable conduct:

> Anti-discrimination laws and lawsuits have "educated" would-be violators such that extreme manifestations of discrimination are thankfully rare. . . . Regrettably, however, this in no way suggests that discrimination based upon an individual's race, gender, or age is near an end. Discrimination continues to

---

[6] Defendants even contend that alleged use of the N-word cannot be considered "racially motivated" because it was "not directed" to Plaintiff. *See* Defs.' Mot. 12. I disagree. As I have previously explained: "The remark is hardly ambiguous when it comes to racial prejudice, as it has been described as the 'paradigmatic slur' toward African Americans and the 'most socially consequential insult.'" *Mason v. Se. Pennsylvania Transp. Auth.*, 134 F. Supp. 3d 868, 875 (E.D. Pa. 2015) (citing Randall Kennedy, *Nigger: The Strange Career of a Troublesome Word* 27, 32 (2002)).

> pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms. It has become easier to coat various forms of discrimination with the appearance of propriety . . . . [D]efendants of even minimal sophistication will neither admit discriminatory animus or leave a paper trail demonstrating it. . . .
>
> The sophisticated would-be violator has made our job a little more difficult. Courts today must be increasingly vigilant in their efforts to ensure that prohibited discrimination is not approved under the auspices of legitimate conduct, and a plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled . . . [by] crabbed notions of relevance or excessive mistrust of juries.

85 F.3d at 1081–82 (internal citations omitted). Acknowledging this reality, the Third Circuit has repeatedly held that courts must consider evidence of discrimination in context to determine if otherwise neutral conduct gives rise to an inference of discrimination. *See Andrews*, 895 F.2d at 1484 ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario. . . . What may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents."); *Aman*, 85 F.3d at 1082, 1086 (holding that "[e]vidence of prior acts of discrimination is relevant to an employer's motive even where this evidence [alone] is not extensive enough to establish discriminatory animus" and that evidence of a hostile work environment or of discrimination against other employees is relevant to the pretext analysis) (citation omitted); *Caver v. City of Trenton*, 420 F.3d 243, 264 (3d Cir. 2005) ("Although the racist comments involved in this case cannot alone be the basis of a hostile work environment claim, evidence of those comments may be considered in determining whether [defendants'] facially neutral conduct . . . was actually based on [plaintiff's] race."); *Cardenas v. Massey*, 269 F.3d 251, 261–62 (3d Cir. 2001) (holding that the trial court had erred when it failed to "examine the possibility that the defendants' 'management decisions' masked discriminatory intent"

because "[t]he advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment"); *see also Dubrey v. SEPTA*, 2014 WL 4631987, at *6 (E.D. Pa. 2014) ("A speaker's racially discriminatory intent may be inferred from context and tone.").

The record here presents both disputed issues of fact, and critical issues of the interpretation of those facts.

## IV. Conclusion

Viewing Plaintiff's evidence in the totality of the circumstances, I conclude that as to Plaintiff's hostile work environment claim, a fact finder could reasonably infer that race was a substantial factor in the discrimination she experienced, *see Andrews*, 895 F.2d at 1485, and that the discrimination amounted to a change in the terms of her employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). On her disparate treatment claim, I likewise find that a jury could reasonably find that Plaintiff was constructively discharged and that Defendants' proffered reason—office management—was a fabricated justification for their conduct toward Plaintiff. Defendants' motion is therefore denied as to those claims, but granted as to Plaintiff's retaliation claim.

/s/ Gerald Austin McHugh
United States District Judge